UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| MICHELLE RUGGIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CAUSE NO. 3:14-CV-1916 JD |
| vs. | ) | |
| | ) | |
| TYSON FOODS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on the Defendant's Motion for Summary Judgment, filed by Defendant, Tyson Foods, Inc., on December 16, 2015 [DE 21]. For the reasons set forth below, the Motion for Summary Judgment [DE 21] is **GRANTED**. The Clerk is **ORDERED** to dismiss Plaintiff's claims **WITH PREJUDICE** and to **CLOSE** this case.

<u>Background</u>

Plaintiff, Michelle Ruggio, states claims against her former employer, Tyson Food, Inc. ("Tyson") for interference and retaliation under the Family Medical Leave Act ("FMLA"). Ruggio claims Tyson pressured her to return to work prematurely from her first FMLA leave (before she had recovered from pneumonia), which caused her to take a second FMLA leave, and then miss additional work after she returned to her job. In contrast, Tyson contends Ruggio missed over three weeks of work for reasons unrelated to her FMLA leaves, and that when she called off work multiple times in December 2013 due to illness and transportation issues, Plaintiff accrued over eight instances of absences which resulted in her termination pursuant to Tyson's attendance policy.

Ruggio filed her complaint on September 24, 2014 [DE 1] alleging interference with FMLA rights (Count I) and retaliation for exercise of FMLA rights (Count II). Tyson filed the instant motion for summary judgment on December 16, 2015 [DE 21]. Ruggio filed a brief in opposition on January 14, 2016 [DE 25]. Tyson then filed a reply on February 8, 2016 [DE 31]. Consequently, the instant motion is fully briefed and ripe for adjudication.

Facts

Ruggio began her employment with Tyson on September 7, 2012, as an Accounting Clerk I, Yields [Deposition of Michelle Ruggio ("Ruggio Dep.") at 46-47]. Her position fell into the category of "Management Support" [Ruggio Dep. at 48]. She worked the B shift, normally starting around 2:45 p.m. and working until 9 or 10 p.m. [Ruggio Dep. at 81]. Ruggio was the only B shift Yields accounting clerk for Tyson during her employment [Deposition of Peggy Slater ("Slater Dep.") at 11]. To cover for Ruggio during any absence, Tyson cross-trained other employees [Slater Dep. at 11-13]. However, the other cross-trained employees maintained separate duties from Ruggio within the accounting department [*Id.*].

Upon being hired as an Accounting Clerk 1, Ruggio took orientation [Ruggio Dep. at 47]. According to Tyson's Management Support Attendance Policy, Tyson terminates employees for "excessive absences" [Declaration of Kelly Robertson ("Robertson Decl.") ¶ 7; Ex. A]. The policy defines "excessive absences as eight or more 'instances'" [*Id.*]. Tyson counted "instances" for a rolling 12 month period, but it did not count any instance older than 12 months against the employee [*Id.*].

Tyson's Complex Human Resources Manager, Kelly Robertson ("Robertson") was responsible for enforcement of the attendance policy during Ruggio's employment [Deposition

of Kelly Robertson ("Robertson Dep.") at 29; Robertson Decl. ¶ 9.  According to Robertson, the plant practice was that absences on consecutive days for non-work illness were considered  one "instance" under the attendance policy [Robertson Dep. at 30; Robertson Dec. ¶ 8].   According to Robertson, absences for all other reasons accrued an "instance" under the policy for each day missed [Robertson Decl. ¶ 8].  Consecutive days for these absences for other reasons were not aggregated into a single instance [*Id.*].   However, during his deposition, Robertson was questioned about the Management Support Attendance Policy (Exhibit A to Robertson Decl.), and he confirmed the policy states that an "instance" is "one or more consecutive days of absence not listed as an excused absence." [Management Support Attendance Policy, 6.1.2]. According to the policy, if an absence is excused, it is not an "instance." [*Id.*, Robertson Dep. at 49].[1]

Tyson claims that in early 2013, Ruggio started accruing "instances" under the attendance policy [Robertson Decl. ¶ 12, Ex. E].  Plaintiff disputes that she began accruing "instances" because each of the absences was "excused" on the HRIS report, and thus, she

---

[1]The parties fundamentally disagree on what constitutes an "instance" and an excused absence under the policy.  Tyson claims, through the deposition and declaration testimony of Robertson, that under plant practice: absences on consecutive days for non-work illness were considered one instance and absences for all other reasons (including transportation problems) accrued an instance for each day missed [Robertson Dep. at 29-30; Robertson Decl. ¶¶ 8-9].  On the other hand, Ruggio points to the Tyson Management Support Attendance Policy, which provides that an "instance" is "one or more consecutive days of absence not listed as an excused absence." [Management Support Attendance Policy, 6.1.2].  According to the policy, if an absence is excused, it is not an "instance." [*Id.*].  In reviewing Ruggio's "Calendar Card Reporting Disciplinary Action,"  all of Ruggio's absences are listed on that report as "absent - excused," thus, Ruggio claims she accrued zero "instances" under the attendance policy.   However, Tyson points to the attendance policy which states an "excused" absence is "[i]nstances excused in advance by the Team Member's supervisor, absences protected by the Family Medical Leave Act, or excused by other Company Policy *e.g.* Jury Duty, Leave of Absence, Vacation, Holidays, Bereavement." [Robertson Decl., Ex. A.]  Tyson states that the HRIS system, or the automated call-in system, uses the term "excused absence" to indicate that the team member, did, in fact, call into the automated call-in system to notify Tyson that she would not be at work that day [Robertson Dep. at 50-51].  Thus, the term "excused absence" was used by the HRIS system to distinguish between an employee that properly followed the attendance call in procedure, and one that was a no-call and failed to show for work on a particular day [*Id.*].

claims, not an "instance" within the meaning of the policy. According to Tyson's records, between February and August 2013, Ruggio accrued five instances - two for non-work illnesses and three for transportation issues [Declaration of Peggy Slater ("Slater Decl.") at ¶ 6, Ex. A]. Ruggio was notified of the instances. [*Id.*].

Ruggio received two attendance notifications during that period. Each time, Peggy Slater ("Slater"), Tyson's Accounting Manager and Plaintiff's supervisor, explained the attendance policy and how the instances were counted [Slater Decl. ¶¶ 7-8]. Instances under the policy and plant practice were numbered and connected to the corresponding absences [Slater Decl. ¶ 6]. The numbering of the instances showed that consecutive absences for non-work illness were considered a single instance [Slater Decl. at ¶ 6, Ex. A]. The numbering also showed consecutive absences for transportation were separate instances for each day of absence [*Id.*]. Both times, Ruggio signed the notifications without comment [Slater Decl. ¶ 10, Ex. A].

On October 14, 2013, Ruggio saw Nurse Practitioner Laura Brown ("NP Brown") for a cough [10/14/2013 Medical Record for NP Brown, TYSON NP 000061-62]. NP Brown ordered x-rays [*Id.*]. Ruggio's October 16, 2013 chest x-ray revealed pneumonia in her left lung [Radiology Report, dated 10/16/2013, TYSON NP 000237]. After the completion of Ruggio's prescribed antibiotics, an October 30, 2013 x-ray showed an "essentially complete clearing" of the left lung pneumonia [Radiology Report, dated 10/13/2013, TYSON NP 000231]. On November 1, 2013, NP Brown released Ruggio to return to work without restrictions effective November 4, 2013 [Robertson Decl. ¶ 12, Ex. C].

Ruggio requested FMLA designation for her absences from October 14 through November 3, 2013 [ Medical Records of NP Brown, TYSON NP 000069-73]. NP Brown

provided Tyson with an FMLA Certification of Health Care Provider on November 1, 2013 [*Id.*].

NP Brown certified Ruggio "had pneumonia and should not be in the workplace until November

4, 2013." [*Id.*]. NP Brown also certified that Ruggio had an x-ray on October 30, 2013,

"showing pneumonia resolved," and that Ruggio's incapacitation would be for a single

continuous period of time between October 14, 2013, and November 4, 2013 [*Id.*]. NP Brown

also certified that Ruggio's condition would not cause episodic flare-ups, she would not need to

attend follow-up treatment, or work part-time or on a reduced schedule [*Id.*]. Tyson

retroactively designated Ruggio's absences from October 14 through November 2, 2013, as

FMLA leave [Robertson Decl. ¶ 12, Ex. C].

Approximately one week after returning to work without restrictions, Ruggio left for a

second medical leave. On November 14, 2013, Ruggio saw NP Brown for chest pain radiating

to the left and right shoulder [11/14/2013 Medical Record for NP Brown, TYSON NP 000074-

76; Robertson Decl. ¶ 12, Ex. C]. NP Brown noted Ruggio "had pneumonia about a month ago

and was treated and pneumonia was resolved." [*Id.*]. An EKG and chest x-ray were taken

[Medical Record for NP Brown, TYSON NP 000077, 000093]. Both tests were normal, with no

signs of pneumonia [*Id.*]. NP Brown released Ruggio to return back to work with no restrictions

on November 25, 2013 [Robertson Decl. ¶ 12, Ex. C].

Ruggio requested FMLA designation of her leave from November 14 to 24, 2013

[Medical Records of NP Brown, TYSON NP 000079-83; Robertson Decl. ¶ 12, Ex C]. NP

Brown provided Tyson with a second FMLA Certification of Health Care Provider on November

20, 2013 [Medical Records of NP Brown, TYSON NP 000079-83]. NP Brown listed Ruggio's

condition as a "fever of unknown origin - chest pain and cough" [*Id.*]. For the duration of the

condition, NP Brown stated "unsure awaiting test results" [*Id.*]. She certified that Ruggio's incapacitation would be for a single continuous period of time [*Id.*]. NP Brown also certified that Ruggio would not need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the alleged medical condition [*Id.*]. Tyson again retroactively designated Ruggio's absences from November 14 through November 24, 2013, as FMLA leave [Robertson Decl. ¶ 12, Ex C].

Ruggio returned to work on November 25, 2013. During the next three weeks, she was absent several times. Each time, Ruggio called into Tyson's designated absence notification system [Ruggio Dep. at 60]. Each time on the phone, Ruggio selected either "non-work illness" or "transportation" as the reason for her absence [*Id.*]. In December 2013, Ruggio missed the following days for the following reasons: December 4, 2013 (non-work illness); December 11, 2013 (non-work illness); December 13, 2013 (non-work illness); December 16, 2013 (non-work illness); December 17, 2013 (non-work illness); December 18, 2013 (transportation); December 19, 2013 (transportation); December 20, 2013 (transportation) [Ruggio Dep. at 178-80; Robertson Decl. ¶ 13, Ex. D].

Tyson contends that Ruggio did not seek medical attention for her absences in December 2013 [Ruggio Dep. at 180-81; Medical Record for NP Brown, TYSON NP 000057-59]. Ruggio disputes this fact, stating "Defendant's designated evidence does not support Defendant's proposition" [DE 25 at 4]. During her deposition, when asked if she went to see the doctor during her December absences, Ruggio stated, "I don't recall." [Ruggio Dep. at 180.] When asked which doctor she would have gone to, if she did, she replied, "Dr. Brown." [*Id.*]. When asked whether Dr. Brown's records would reflect any appointment Ruggio had with her on any

of those December days, Ruggio answered, "Yes. It would." [Ruggio Dep. at 181.] The Court reviewed NP Brown's documents, and did not see any documents reflecting Ruggio visiting NP Brown in December 2013. Additionally, later in her deposition, Ruggio was asked, "[d]o you have any medical documentation that shows you had pneumonia past November 25th of 2013?" and she answered, "I didn't go back to the doctor. I just used ibuprofen and aspirin. It was winter" [Ruggio Dep. at 201].

Tyson contends that Ruggio did not speak to anyone at Tyson about the reasons for her December absences [Ruggio Dep. at 181-82]. Ruggio disputes this fact, stating "Defendant's designated evidence contradicts this proposition" [DE 25 at 4]. During her deposition, Ruggio testified that they were automated call-ins [Ruggio Dep. at 181]. When asked specifically if she recalled giving any additional information above and beyond the automated selection for the December absences, Ruggio said, "I don't recall," but added that she "believe[d] she called the office when [her] wheel hub broke." [*Id.* at 181-82].

According to Tyson, as of December 20, 2013, Ruggio had accrued the following "instances" under Tyson's attendance policy and plant practice:

| Date(s) of Absence(s) | Reason for Absence(s) | Instance Under the Attendance Policy |
|---|---|---|
| Feb. 19-22, 2013 | Non-work illness | First |
| March 6, 2013 | Transportation | Second |
| March 7, 2013 | Transportation | Third |
| March 25, 2013 | Transportation | Fourth |

| | | |
|---|---|---|
| August 5, 2013 | Non-work illness | Fifth |
| December 4, 2013 | Non-work illness | Sixth |
| December 11, 2013 | Non-work illness | Seventh |
| December 13-17, 2013 | Non-work illness | Eighth |
| December 18, 2013 | Transportation | Ninth |
| December 19, 2013 | Transportation | Tenth |
| December 20, 2013 | Transportation | Eleventh |

[Ruggio Dep. at 178-81; Robertson Decl. ¶ 13; Ex. D].

According to Tyson, Ruggio missed 16 days of work, separate from her two FMLA leaves, in an 11th month period [Robertson Decl. ¶ 13, Ex. D]. The "Calendar Card Reporting Disciplinary Action" indicates the "policy violated" is "excessive absenteeism" and "disciplinary action: termination." [DE 23-3 at 31-33]. Robertson states in his affidavit that "[t]he information contained in this document is automatically generated by Tyson's computerized call-in system and records instantaneously all information provided by a Tyson employee who calls in to notify Tyson they will not be at work that day." [Robertson Decl. ¶ 13]. Robertson then reviewed Ruggio's attendance [Robertson Dep. at 24, 26]. Robertson consulted with his supervisor, Rick Nimrick, and Robertson concluded that Ruggio should be terminated pursuant to the policy, effective December 22, 2013 [*Id.*].

Tyson claims that at the time of Ruggio's termination, neither Robertson nor Slater knew that Ruggio had exercised her rights under the FMLA in October and November 2013 [Robertson Dep. at 31; Slater Dep. at 23]. They were aware she had taken a medical leave, but they did not know the leave was retroactively designated as FMLA leave [*Id.*]. Ruggio

8

disputes that Robertson and Slater did not know about the FMLA leave [DE 25 at 4].  During

his deposition, Robertson testified:

> Q.      When did you first become aware that Michelle Ruggio requested the family
> medical leaves in October and November of 2013?
>
> A.      I don't recall.
>
> Q.      Were you made aware of the family medical leave requests before you talked to
> Rick Nimrick about terminating Michelle?
>
> A.      No.
>
> Q.      So when you recommended termination you didn't know anything about the
> family medical leave requests?
>
> A.      I knew she had been on a leave.
>
> Q.      Did you know that that leave was pursuant to the Family Medical Leave Act?
>
> A.      No.

[Robertson Dep. at 31].  During Slater's deposition, she testified as follows:

> Q.      Did Michelle ever apply for Family Medical Leave while she was working for
> you?
>
> A.      I don't know if she did or not.

[Slater Dep. at 23].

Plaintiff has a different view of the facts.  According to Ruggio, she thinks Peggy

Slater contacted her about one week or a week and a half into her first FMLA leave in October

and told Ruggio that she was going to have to post her job if she did not come back [Ruggio

Dep. at 132].[2]  Ruggio told Slater that she had pneumonia and she could not come back

[Ruggio Dep. at 132].

---

[2]Slater denies telling Ruggio that her job would be posted if she did not come back to work, or otherwise
discouraging Ruggio from taking any leave [Slater Dep. at 33-35].

Then, later during her first leave, Ruggio went into the office to talk to Robertson.

According to Ruggio, Robertson said:

> [T]hey didn't have anyone to replace me and nobody knew how to do my job. And I had to hurry up and, you know, come back and they needed me right away; that it was a mess and that HR was upset and, you know. They needed a yields clerk in there. You know, basically implying that if I didn't come back, they couldn't hold my job. And I believe he even said that there wasn't much he could do if I didn't come back. I had to come back right away; they needed me. And I told him I was still sick, and I showed him my pill bottle. I said, "See, I'm still taking pills." And he said, "Well, we have to have you come back. We need our yields clerk and HR is getting mad." So I told him I'd try. And then I went to my doctor and I got very upset, told her I have to go back to work. And she said, "I didn't really want to release you this soon; you need to rest." And I said, "I don't care. I'm going to lose my job if you don't let me go back. What am I supposed to do if I don't have a job? I need my job." We argued about it for a little while, then she said okay, she'll release me. And I got – I guess I got the X-rays and she released me.

[Ruggio Dep. at 141-42.][3] Ruggio also said that Robertson told her "HR is getting really upset, and you have to come back quickly" and "I don't know how much longer we can hold them off" and "I can hold it for a while but we may have to post it if you don't come back right away" [Ruggio Dep. at 143-45]. When Ruggio returned from her first leave on November 4th, Yulonda Baldwin, one of Ruggio's supervisors, told her "don't do that again." [Ruggio Dep. at 166].

During his deposition, Robertson admitted that two of Ruggio's consecutive-day absences for transportation issues were counted as more than one "instance" under plant practice (March 6 and March 7; and December 18-20), but that according to only the written

---

[3]Tyson disputes this version of the conversation between Robertson and Ruggio, and claims Robertson never demanded Ruggio immediately return to work or otherwise alter her treatment in any way [DE 31 n. 1]. Moreover, when Ruggio was asked if Robertson ever explicitly told her that her job would not be available if she did not return immediately, she answered, "[h]e just said that they needed a yields clerk in there, so I had to come back." [Ruggio Dep. at 144].

published policy, they would have each been counted as only one absence [Robertson Dep. at 39-40]. Gabriella Moore, Robertson's assistant, knew that Ruggio had filed for and been certified for FMLA leave [Robertson Dep. at 7; Def.'s Ex. 3]. Jovita Oroozco, who also reports to Robertson, handled some of Ruggio's paperwork and knew that Ruggio applied for leave [Ruggio Dep. at 133-35].

Ruggio testified that after she returned to work following the first FMLA leave, she had a "relapse" and "the pneumonia came back and it was worse than before" [Ruggio Dep. at 155]. She said she should have listened to her doctor and rested more, but she came back to work because Robertson said they needed her [Ruggio Dep. at 155]. Ruggio stated that after her second FMLA leave, when she came back, she was still "pretty weak" and she had to "catch up all the work and train people. And it was wearing [her] out." [Ruggio Dep. at 178]. She said she was tired, and "ill for a long time" [Ruggio Dep. at 179]. Ruggio believes she did not really recover from her pneumonia until a few months after December 2013 [Ruggio Dep. at 201].

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining

whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

The Court notes that it must avoid the temptation to "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). In light of the requirement that the court must view all facts in the light most favorable to the nonmoving party, the Court must credit Ruggio's version of the facts. However, the Court does not vouch for the truth of those facts, rather, it uses them to determine whether a genuine issue for trial exists. *See Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1044-45 (7th Cir. 2002).

I.     FMLA Interference

The FMLA grants eligible employees with a serious health condition that renders the employee unable to perform her job the right to take up to twelve workweeks of medical leave

during each twelve-month period. 29 U.S.C. § 2612. Under the Act, an employee on leave is entitled to be restored to the same or an equivalent position that she had before she took qualifying leave. 29 U.S.C. § 2614(a)(1)-(2).

The FMLA also makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise [FMLA rights]". 29 U.S.C. § 2615(a)(1); *see also* 29 C.F.R. § 825.220(b) (although the FMLA does not define interference, this regulation provides that "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."). "To prevail on an FMLA interference claim, an employee must show that her employer deprived her of an FMLA entitlement." *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 498 (7th Cir. 2014) (quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 761 (7th Cir. 2008)).

The parties agree on the applicable standard. Specifically, to make a claim for FMLA interference, Ruggio must establish: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take FMLA leave; and (5) her employer denied or interfered with FMLA benefits to which she was entitled. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015). The first requirement which is disputed by the parties is the third element, whether Ruggio has shown that she was entitled to FMLA leave.

When an employee like Ruggio argues her employer interfered with her substantive rights under the FMLA, the employee must "establish[], by a preponderance of the evidence, that [s]he is entitled to the benefit [s]he claims." *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d

711, 713 (7th Cir. 1997).  The employee carries the burden of demonstrating her right to the entitlement.  *Allen v. Fort Wayne Foundry Corp.*, No. 1:04-CV-60, 2005 WL 2347266, at *5 (N.D. Ind. Sept. 26, 2005) (citing *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000)).

      A.     <u>First FMLA Leave  - October 14, 2013 through November 3, 2013</u>

With regard to the first FMLA leave, Ruggio argues that Robertson and Slater "interfered with Ruggio's first leave under the FMLA, causing Ruggio to cut her leave short." [DE #25 at 12].  Despite the alleged statements by Robertson and Slater, a review of the medical evidence indicates that Ruggio returned to work after the pneumonia had cleared, and that she received all the leave she requested.

After the completion of Ruggio's prescribed antibiotics, the October 30, 2013 x-ray showed the left lung had cleared.  Indeed, NP Brown certified that Ruggio had an x-ray on October 30, 2013 "showing pneumonia resolved." [TYSON NP 000069-73].  On November 1, 2013, NP Brown released Ruggio to work without restrictions, effective November 4, 2013. NP Brown certified that Ruggio's incapacitation would be for a single continuous period of time between October 14, 2013 and November 3, 2013, that the condition would not cause episodic flare-ups, Ruggio did not need to attend follow-up treatment, or work part-time on a reduced schedule [*Id.*].  Ruggio received the FMLA leave she requested when Tyson retroactively designated her absences from October 14, 2013 through November 3, 2013, as FMLA leave.

Even taking Ruggio's version of the events as true (as this Court must at this stage of the proceedings), and that Ruggio begged NP Brown to release her to work based upon

14

Ruggio's conversations with Robertson and Slater, there is simply no medical evidence that Ruggio was entitled to additional leave based upon the undisputed medical evidence showing that the pneumonia had cleared and that NP Brown released her to work with no restrictions. Under these circumstances, there was no interference with Ruggio's FMLA rights. For example, in *Chism*, the Court found no interference with the plaintiff's rights under the Act when the evidence demonstrated that the plaintiff was granted FMLA leave on several occasions and "was never denied such leave." *Chism v. Con-Way Freight, Inc*., 3:08-CV-387, 2009 WL 3111274, at *21 (N.D. Ind. Sept. 24, 2009). Similarly, the district court in *Golden Chautauqua Airlines, Inc.*, granted summary judgment on an interference with FMLA claim where the employer "was not happy that Plaintiff would be away from work for twelve weeks. However, there is no evidence that his comments caused injury to Plaintiff, as Plaintiff received all the leave he requested." *Golden v. Chautauqua Airlines, Inc*., No. 1:05-CV-786, 2007 WL 925020, at *14 (S.D. Ind. Mar. 26, 2007).

> B.      Second FMLA Leave - November 14, 2013 through November 24, 2013

Ruggio argues in her memorandum that "[it] ought not be surprising that an employer's threats of job loss would have a chilling effect on use of further FMLA leave" [DE 25 at 12]. Yet, the threats occurred near the beginning of her first FMLA leave, and Ruggio did indeed request and receive a second FMLA leave to cover medical absences in November 2013. Ruggio concedes that no comments were made during her second FMLA leave [Ruggio Dep. at 197].

Ruggio argues that her second FMLA leave was due to a relapse of the pneumonia, which was the result of being forced to return to work early. However, the medical records

state that her November leave was for "chest pain." [TYSON NP 000074-76]. NP Brown

indicated that Ruggio "had pneumonia about a month ago and was treated and pneumonia

resolved." [*Id.*]. An EKG and chest x-ray were taken, and both were normal, with no signs of

pneumonia [TYSON NP 000077, 000093]. NP Brown released Ruggio back to work with no

restrictions on November 25, 2013. During the certification of this FMLA leave, NP Brown

listed the condition as "fever of unknown origin - chest pain and cough" and once again

certified the incapacitation would be for a single continuous period of time, and Ruggio did

not need follow-up treatment appointments, or work part-time or on a reduced schedule

because of the medical condition [TYSON NP 000079-83]. Per Ruggio's request, Tyson

retroactively designated her absences from November 14, 2013 through November 24, 2013,

as FMLA leave.

As with the first FMLA leave, there is no indication that Tyson denied any rights that

Ruggio was due under the Act. While the Court does not sanction the alleged comments made

by Slater and Robertson during her first leave, there does not seem to be any prejudicial result

as Ruggio fully exercised her rights in taking a second FMLA leave, and then returned to work

again after her doctor released her, with no restrictions. After receiving the medical release,

Tyson returned Ruggio to her job as an accounting clerk. Therefore, no denial of a substantive

right occurred.

    C.    <u>December Absences - Dec. 4, 11, 13, 16, 17, 18, 19, 20</u>

Ruggio argues that the subsequent absences in December were a result of the "coercion

of Ruggio's early return" which set off a chain of events, and those absences "grew out of

Tyson's interference." [DE 25 at 12]. Tyson claims that Ruggio cannot establish that during

December, she was suffering from a serious health condition which was entitled to leave.  In

alleging a deprivation of a substantive right under the FMLA, the employee must establish, by

a preponderance of the evidence, an entitlement to the disputed leave.  *Darst v. Interstate*

*Brands Corp.*, 512 F.3d 903, 908 (7th Cir. 2008); *Mason v. St. Vincent Hosp. and Health Care*

*Ctr.*, No. 1:02-CV LJM VSS, 2004 WL 3242339, at *4-5 (S.D. Ind. Nov. 8, 2004) ("[I]t is not

sufficient for an employee to merely assert that he suffered from a serious health condition; a

claimant must provide evidence of his serious health condition.").

A "serious health condition" is defined by the FMLA as "an illness, injury,

impairment, or physical or mental condition that involves - (A) inpatient care in a hospital,

hospice, or residential medical facility; or (B) continuing treatment by a healthcare provider."

29 U.S.C. § 2611(11).  As this Court has previously noted, "[t]his provision of the FMLA is

aimed at genuinely serious and incapacitating conditions.  It was not intended to mandate, as a

matter of federal law, a uniform national sick leave policy for minor or temporary illnesses and

discomforts."  *Matthys v. Wabash Nat'l*, 799 F.Supp.2d 891, 899 (N.D. Ind. 2011) (quoting

*Mason*, 2004 WL 3242339, at *5).   Ruggio has put forth no evidence that she received

inpatient care in a hospital or any other residential medical care facility.  Thus, she must

submit evidence she was receiving "continuing treatment by a health care provider."  29

U.S.C. § 2611(11).

"Continuing treatment by a healthcare provider" is defined as "[a] period of incapacity

of more than three consecutive, full calendar days" that also involves "[t]reatment two or more

times, within 30 days of the first day of incapacity" or treatment by a healthcare provider that

"results in a regimen of continuing treatment under the supervision of the health care

provider." 29 C.F.R. §825.115(a).   Under either prong, Ruggio must provide evidence of a

period of incapacity lasting more than three, consecutive days.  *See Matthys*, 799 F.Supp.2d at

899; *Mason*, 2004 WL 3242339, at *5-6 (noting a plaintiff must establish a period of

incapacity under the FMLA statutes and regulations defining a serious health condition);

*Kauffman v. Federal Express Corp.*, 426 F.3d 880, 886 (7th Cir. 2005) (same);  *see also Olsen

v. Ohio Edison Co.*, 979 F.Supp.1159, 1164-65 (N.D. Ohio 1997) (finding this a threshold

requirement and if the plaintiff "fails to show that he had an illness or injury which

incapacitated him for more than three days, the Court's inquiry is over and summary judgment

is appropriate").

Ruggio has not provided evidence of a period of incapacity lasting more than three,

consecutive days in December 2013.  In December 2013, Ruggio missed the following days

for the following reasons: December 4, 2013 (non-work illness); December 11, 2013 (non-

work illness); December 13, 2013 (non-work illness); December 16, 2013 (non-work illness);

December 17, 2013 (non-work illness); December 18, 2013 (transportation); December 19,

2013 (transportation); December 20, 2013 (transportation) [Ruggio Dep. at 178; Robertson

Decl. ¶ 13, Ex. D].   This record alone does not establish a period of incapacity lasting more

than three-consecutive days.

Ruggio argues in her opposition memorandum that she had three consecutive sick days

from work over the course of five calendar days (including a weekend). [DE 25 at 13].

December 13, 2013 was a Friday; December 16, 2013, a Monday; and December 17, 2013, a

Tuesday.  Thus, there is a possibility Ruggio was ill over the course of a weekend, from

December 13-17, 2013, but there are no medical documents showing she sought any treatment

during that period, and nothing proving she was incapacitated for those five days. Other than Ruggio's general testimony that she was sick in December, there is no evidence at all about the severity of her condition, no medical documents to indicate she was incapacitated over the weekend, and no medical evidence to indicate she was incapacitated for any of the medical absences in December. This is not sufficient to show she had a serious health condition for more than three consecutive days. *See Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 499 (7th Cir. 1999) ("Whether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging [her] condition to be so."); *Bell v. Jewel Food Store*, 83 F.Supp.2d 951, 959 (N.D. Ill. 2000) ("[Plaintiff's] own statement is not enough to establish he was incapacitated: [he] must provide evidence from a medical professional or health care provider that he was unable to work"); *Levine v. Children's Museum of Indianapolis*, No. IP00-0715-C-H/G, 2002 WL 180054, at *6 (S.D. Ind. July 1, 2002) (granting summary judgment for employer where employee offered only his and his wife's statement that he was incapacitated, and offered no evidence from a health care provider showing need to take time off from work). As the Seventh Circuit found in *Haefling*, without evidence from a treating physician, the plaintiff's self-serving assertions regarding the severity of his medical condition and the treatment it required were insufficient to raise an issue of fact under the FMLA. *Haefling*, 169 F.3d at 500.

In this case, Ruggio's deposition testimony that she was sick in December and could not work is insufficient to raise an issue of fact under the FMLA about whether she was incapacitated for more than three consecutive days. When a plaintiff fails to show that she

was incapacitated for more than three days, summary judgment is appropriate.  *See Matthys*, 799 F.Supp.2d at 899 (granting summary judgment on FMLA interference claim where the plaintiff "presented no evidence to establish that she had a period of incapacity, and can, therefore, not establish that she suffered from a serious health condition, as defined by the regulations."); *Darst*, 512 F.3d 910 (affirming summary judgment for employer, stating "[o]f course, there could be no interference if [the employee] had no right to FMLA leave" on the days in question).  Therefore, the Court could grant summary judgment on this basis alone.

Even assuming, *arguendo*, Ruggio could establish that she had an incapacity for more than three consecutive days (from December 13-17, 2013), she still has to prove that her condition  involved "[t]reatment two or more times, within 30 days of the first day of incapacity" or "treatment by a healthcare provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider."  29 C.F.R. §825.115(a).  The only potential way Ruggio could show that she was treated two or more times within 30 days of the first incapacity is if her absences in December could somehow be tied to her pneumonia in October.  However, NP Brown certified the first illness was pneumonia, it was resolved, it was not a chronic condition requiring followup appointments, and NP Brown certified the second illness was "fever of unknown origin - chest pain and cough." [TYSON NP 000079-83].  Moreover, the EKG and chest x-ray taken during the second illness came back normal, with no signs of pneumonia.  Plaintiff cannot prove she sought any medical attention for her absences in December 2013.  While Ruggio claims she cannot remember if she went to the doctor, at another point in her deposition, she admits she did not see NP Brown in December [Ruggio Dep. at 201] , and the medical records

definitively show that she did not visit NP Brown in December 2013. As such, Ruggio cannot show that her absences in December 2013were somehow tied to the pneumonia she had in October 2013.

The other avenue Ruggio can prove to establish she had a serious health condition which entitled her to leave is treatment by a healthcare provider that results in a regimen of continuing treatment under the supervision of that provider. Specifically, the statute states "[t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.115(a)(2). Tyson argues because NP Brown released Ruggio from both illnesses, certified the illnesses were for a single period of time, Ruggio would not need to attend follow-up treatment appointments, and Ruggio was released to work with no restrictions, there was no regimen of continuing treatment. Plaintiff argues she satisfies this requirement because on November 20, 2013, NP Brown prescribed Ruggio a thirty-day treatment of DuoNeb, which she took through December 20, 2013 [DE 25 at 13]. It is true that the federal regulations provide "A regimen of continuing treatment includes, for example, a course of prescription medication . . . ." 29 C.F.R. § 825.113(c). Yet it might be difficult for Ruggio to prove she was under a regimen of continuing treatment under the supervision of a healthcare provider since she was released from the previous illness, and did not see a health care provider during December. Nevertheless, in accordance with the C.F.R. on prescription medication, Ruggio may be able to satisfy this element.

Even if Ruggio could somehow establish that she suffered from a serious health condition in December, her claim for FMLA interference still fails. Ruggio has not proven the

fourth element of her prima facie case - that she provided sufficient notice of her intent to take leave. Under the FMLA, an employee must provide the employer with at least enough information to put the employer on notice that she needs FMLA-qualifying leave. The employee's main duty in notifying her employer is to provide enough information to the employer "to show that [she] *likely* has an FMLA-qualifying condition." *Burnett v. LFW Inc.*, 472 F.3d 471, 479 (7th Cir. 2006) (emphasis in original). As the Seventh Circuit specifically found, "[c]alling in sick without providing additional information does not provide sufficient notice under the FMLA." *de la Rama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008) (citing *Burnett*, 472 F.3d at 479; *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001) ("'Sick' does not imply 'a serious health condition.'")).

When Ruggio called in her December 2013 absences, it was through the automated call center. She indicated only that she was out due to illness, and she did not supply any additional information to Tyson about her illness. When asked specifically if she recalled giving any additional information above and beyond the automated selections for the December absences, she said "I don't recall," but added that she "believe[d] she called the office when [her] wheel hub broke." [Ruggio Dep. at 181-82]. So the only possible additional information Ruggio gave Tyson was related to her transportation issues, not any medical issues. Moreover, nothing in Ruggio's medical file could have alerted Tyson that Ruggio had any continuing medical issues, because NP Brown had certified that Ruggio would not have ongoing issues or need further follow-up appointments, and she was released to work with no restrictions. Ruggio gave Tyson no notice that she was suffering from a condition that would require an extended period of leave. Ruggio has provided no evidence that she gave Tyson

any notice about the December absences or that she wanted to take leave for them. This is insufficient to establish an interference claim. *de la Rama*, 541 F.3d at 687 (affirming district court's finding that employee failed to provide sufficient notice of her intent to take FMLA leave when employee merely called in sick and never indicated she suffered from a condition that required an extended period of leave).

Finally, the Court notes that there is no evidence that Tyson denied or interfered with any FMLA benefits to which Ruggio was entitled. At no time did Tyson deny Ruggio's request for FMLA leave - indeed, it granted Ruggio's first two requests, and it is undisputed that Ruggio did not give notice or request leave for the December absences. For all the reasons mentioned above, summary judgment is appropriate on Ruggio's claim for interference with FMLA leave.

II.     FMLA Retaliation

The FMLA also affords protection to employees who are retaliated against because they exercised their right to take leave. 29 U.S.C. § 2615(a)(2) makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." Additionally, 29 U.S.C. § 2615(b) makes it unlawful to "discharge" or "discriminate" against a person for taking part in proceedings or inquiries under the FMLA. The Seventh Circuit has construed these provisions as establishing a cause of action for retaliation under the FMLA. *See, e.g., Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008); *Kauffman*, 426 F.3d at 884.

A plaintiff claiming FMLA retaliation may make her case under the same direct or indirect methods of proof that is utilized in Title VII cases. *Smith v. Hope Sch.*, 560 F.3d 694,

702 (7th Cir. 2009). Ruggio proceeds under the direct method of proving retaliation [DE #25 at 18]. To survive summary judgment under the direct method, a plaintiff employee must present evidence of: (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Matthys*, 799 F.Supp.2d at 907 (citing *Simpson v. Office of the Chief Judge of the Cir. C. of Will Cnty.*, 559 F.3d 706, 717 (7th Cir. 2009); *Smith*, 560 F.3d at 702 ("[a]n employee proceeding under the direct method must demonstrate that her employer intended to punish her for requesting or taking FMLA leave")).

An employee may demonstrate retaliation by presenting either direct or circumstantial evidence. Here, Ruggio presents circumstantial evidence [DE 25 at 18]. The Seventh Circuit has considered circumstantial evidence like "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence non conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *see also Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). Another type of circumstantial evidence available to a plaintiff using the "convincing mosaic" approach is evidence "that similarly situated employees were treated differently." *Coleman v. Donahue*, 667 F.3d 835, 860 (7th Cir. 2012) (quotation omitted).

Ruggio's claim for FMLA retaliation fails as a matter of law because she cannot satisfy the causal connection element. Ruggio argues that her employment would not have been terminated under the written attendance policy, and that the use of the plant practice is a cover-up for the real reason for her termination - retaliation for her use of FMLA leave. Specifically, Ruggio contends that under the written policy, she "only had seven instances not

24

tainted by Defendant's interference with Ruggio's leave." [DE 25 at 16].[4]  Yet, this Court has

already found that the December absences did not qualify for FMLA leave, and Ruggio

provides no case law to support her argument that the December absences should not be

counted toward her absences under the attendance policy because they were "tainted."

Moreover, as Tyson points out, even solely under the written attendance policy (excluding the

plant practice), Ruggio still would have accrued eight instances warranting termination of her

employment: February 19-22 ("non-work illness," first instance); March 6-7 ("transportation,"

second instance); March 25 ("transportation," third instance); August 5 ("non-work illness,"

fourth instance); December 4, 2013 ("non-work illness," fifth instance); December 11 ("non-

work illness," sixth instance); December 13-17 ("non-work illness," seventh instance);

December 18-20 ("transportation," eighth instance).  Robertson's statement that "[s]ince I

have been enforcing the Management Support Attendance Policy, no employee has been

allowed to maintain their employment with Tyson after accruing eight (8) instances under the

Management Support Attendance Policy" [Robertson Decl. ¶ 10] is uncontroverted, and

Ruggio has not pointed to any other employee who had eight or more instances, but was not

terminated.

Ruggio has not provided a mosaic of evidence to support her argument that her

termination was causally linked to her FMLA leave.  Under the "convincing mosaic" standard,

the circumstantial evidence must "point directly to the discriminatory reason for the

employer's action."  *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)

---

[4] According to Ruggio, February 19-22 counts as the first instance, March 6th the second, March 7th the
third, March 25th the fourth, August 5th the fifth, December 18th the sixth, and December 19th the seventh instance
[DE 25 at 16].  Ruggio has omitted the last absence on December 20th for "transportation issues," and includes no
argument whatsoever about why this should not be an absence under the attendance policy.

(quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). Even assuming at this stage of the proceedings that Robertson knew Ruggio previously took FMLA leave, Tyson uniformly applied its plant practice and enforcement of the attendance policy, and Ruggio has presented no evidence to the contrary.

Regarding the comments made by Robertson, Slater, and Baldwin to Ruggio during her first leave, only Robertson was involved in the decision to terminate Ruggio. Therefore, the comments made by Slater and Baldwin are not relevant to the retaliation claims. *See, e.g., Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) (finding plaintiff's reliance on co-worker comments not linked to the ultimate decision maker was insufficient to avoid summary judgment); *Crabtree v. National Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001) (holding stray comments made by non-decisionmakers are not evidence that an employment decision had a discriminatory motive). The comments made to Ruggio by Robertson occurred during her first leave, and subsequently, Tyson granted her a second FMLA leave. Robertson specifically indicated that he has never allowed an employee to remain employed after reaching eight instances under the policy; therefore, the evidence indicates that Ruggio would have been terminated even if she never took the FMLA leaves. Additionally, Ruggio has not pointed to any other similarly situated employee that was treated differently under Tyson's attendance policy.

Ruggio also argues that contributing to the mosaic of evidence is the fact that Ruggio's absences on October 15, 2013 through October 25, 2013 (which were retroactively designated as FMLA leave), initially prompted an attendance notification [DE 25 at 17]. It is undisputed, however, that when the mistaken issue of coding was discovered, it was corrected, and none of

Ruggio's FMLA leave counted towards her absences in the decision to terminate her employment [Robertson Decl. ¶ 12; DE 26-1]. As such, the canceled attendance notification has no significance.

Finally, Ruggio points to the suspicious timing of her termination, which occurred within two months after her initial October leave. However, the Seventh Circuit is clear that such timing, by itself, is insufficient to survive summary judgment. *See Harper*, 687 F.3d at 308 ("[M]ere temporal proximity between the statutorily protected activity and the action alleged to have been taken in retaliation for that activity will rarely be sufficient in and of itself to create a triable issue."); *Sauzek v. Exxon Cola USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation.").

In sum, Ruggio's speculation about Tyson's motives is insufficient. "It is well settled that speculation may not be used to manufacture a genuine issue of fact." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) (citations omitted); *see also Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) (noting that the "subjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of material fact."). Ruggio has not designated evidence from which a rational jury could conclude that Tyson terminated her in retaliation for her taking FMLA leave.

Moreover, even if Ruggio had established a causal connection, Tyson has presented a legitimate, non-discriminatory reason for the adverse action. Termination for failure to abide by an employer's attendance policy is a legitimate reason for termination. *See Allen v. Fort Wayne Foundry Corp.*, No. 1:04-CV-60, 2005 WL 2347266, at *10 (N.D. Ind. Sept. 26, 2005)

(finding violation of attendance policy a legitimate, non-discriminatory reason for termination). The burden then shifts to Ruggio to provide evidence that Tyson's termination based upon the attendance policy was pretextual. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1014 (7th Cir. 2000). As long as Tyson honestly believed its reasons for terminating Ruggio, pretext has not been shown, even if its decision was mistaken, ill-considered, or foolish. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 772 (7th Cir. 2002). Ruggio claims the reason for termination is a lie because Ruggio's absences show up as "excused" under the HRIS automated system; however, Ruggio attended orientation, during which the policy was covered, and she was twice notified earlier in the year when she accrued instances under the attendance policy [Slater Decl. ¶ 6, ¶ 10]. Ruggio apparently did not dispute the accrual of these early instances under the attendance policy because she signed the notifications. Robertson's clear testimony that the term "excused absence" is only used by the HRIS system to distinguish whether the employee properly used the call-in procedure that day has not been contradicted or called into question with any competing evidence, only speculation. Ruggio has failed to show pretext, as mere speculation of pretext is insufficient. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001) ("[plaintiff's] speculation (and that is all that it is) cannot stand to demonstrate pretext."). Accordingly, Tyson is entitled to summary judgment on Ruggio's retaliation claim.

## Conclusion

For the reasons set forth above, the Motion for Summary Judgment [DE 21] is

**GRANTED**.  The Clerk is **ORDERED** to dismiss Plaintiff's claims **WITH PREJUDICE** and to **CLOSE** this case.

SO ORDERED.

ENTERED: April 26, 2016

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court